IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

SHANE VANDERMOLEN                                                                                    PLAINTIFF

V.                            Civil No. 6:14-CV-06001-PKH-MEF

NURSE MICHELLE REEVES, ET. AL.                                                              DEFENDANTS

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

This is a civil rights action filed by Plaintiff, Shane Vandermolen, pursuant to 42 U.S.C. § 1983. Plaintiff is currently incarcerated in the Arkansas Department of Corrections ("ADC"), North Central Unit. Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable P. K. Holmes III, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation.

Currently before me is Defendants' Summary Judgment Motion. (Doc. 19) After careful consideration, the undersigned makes the following Report and Recommendation.

**I.  BACKGROUND**

Plaintiff filed his Complaint on January 9, 2014. (Doc. 1) He alleges denial and delay of medical care for his seizures and difficulty sleeping while a pre-trial detainee in the Garland County Detention Center ("GCDC"). Plaintiff proceeds against all Defendants in both their official and individual capacities. Plaintiff seeks monetary damages. (Doc. 1) Defendants filed their Summary Judgment Motion on May 8, 2015. (Doc. 19) A Summary Judgment hearing was held on December 9, 2015 to permit Plaintiff to respond orally to the Motion. Plaintiff appeared via video conference.

**II.  LEGAL STANDARD**

The Court "shall grant summary judgment if the movant shows that there is no genuine

1

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995).  The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the non-moving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  The Court must view all evidence and inferences in a light most favorable to the nonmoving party.  *See McCleary v. ReliaStar Life Ins. Co.,* 682 F.3d 1116, 1119 (8th Cir. 2012).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  DISCUSSION

Plaintiff alleges the following claims: (1) Defendant Brady, his neurologist, refused to prescribe a sleep aid and refused to increase his amitryptiline "so he can rest," and that he continued to have grand mal seizures despite treatment; (2) Defendant Nurse Reeves delayed access to a specialist along with providing "grossly inadequate treatment;" and, (3) Defendant Branstetter (Jail Administrator) violated his rights by signing his name to a medical complaint that should have sent to Nurse Reeves because Branstetter has no medical background or certificate.  (Doc. 1)

At the hearing, Plaintiff objected to the claim summary as presented by the Court.   More

2

specifically, Plaintiff testified that he had dismissed the claim against Defendant Brady. When queried as to why no document to that effect had been submitted to the Court, Plaintiff stated "he has been having trouble with legal mail." Based on Plaintiff's testimony, it is recommended Defendant Brady be **DISMISSED with prejudice** from the case as a Defendant, and any claims against him will not be addressed.

### A. Official Capacity Claims

Defendants argue Plaintiff has made no allegations about the customs or policies of Garland County Detention Center. Further, the only allegations which might be possibly construed as an official capacity claim is his allegation in a grievance that the jail did not have a nurse on staff twenty-four (24) hours a day. Defendants are not aware of any authority requiring full-time medical personnel at a county detention facility. Plaintiff has not alleged any harm as a result of this lack of round-the-clock medical personnel. (Doc. 20, p. 5)

Under Section 1983, a defendant may be sued in either his individual capacity, in his official capacity, or in both. In *Gorman v. Bartch,* the Eighth Circuit Court of Appeals discussed the distinction between individual and official capacity suits. As explained in the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24–27, 112 S.Ct. at 361–62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25–27, 112 S.Ct. at 362.

*Gorman,* 152 F.3d 907, 914 (8th Cir.1998). "[R]igorous standards of culpability and causation must

be applied to ensure that the [county] is not held liable solely for the actions of its employee" in cases where a plaintiff claims a county has caused an employee to violate the plaintiff's constitutional rights. *Board of County Commissioners, Oklahoma v. Brown,* 520 U.S. 397, 405 (1997).

Despite a lack of any such allegations in his Complaint, Plaintiff testified at the hearing that he was harmed by the lack of nursing care at the jail twenty-four hours per day, seven days per week. He alleges this lack of medical staffing resulted in officers passing out medications, and because of that he was sent into seizures. He testified that in one instance he was given the wrong medicine which caused him to have seizures and be taken to the hospital. He testified the officers and Nurse Reeves could not tell him what he was given by mistake because that would violate the Health Insurance and Portability and Accountability Act ("HIPAA"), and the officers could not be told what he was given either because that would be in violation of HIPAA.  He testified that after this incident, Defendant Reeves put photographs of inmates on the medication log.

He also alleges the officers have "no clue" as to what to do for him when he has a seizure. In August of 2012, an officer put a spoon in his mouth while he was having a seizure, and as a result he chipped a tooth. He has suffered three concussions because the officers failed to place anything soft under his head while he was having seizures and they were waiting for emergency medical staff to arrive.

A prison does have a duty to "promptly provide necessary medical treatment for prisoners," including access to 24-hour emergency care. *Johnson v. Bowers*, 884 F.2d 1053, 1056 (8th Cir. 1989), *modified on reh'g* (Oct. 27, 1989).  This Court, however, cannot find any authority requiring a county jail to have medical staff on hand to provide care for inmates twenty-four hours a day, seven days a week.  Nor is it a constitutional violation for corrections officers to deliver prescription

medication to inmates, provided they have received appropriate training. *Cody v. Hillard*, 599 F. Supp. 1025, 1057 (D.S.D. 1984); *see also* 1 *Rights of Prisoners* § 4:10 Necessary Treatment (4th ed.) (Westlaw, current through Oct. 2015) (citing standards from U.S. Dept. of Justice Federal Standards for Prisons and Jail, ABA Standards for Criminal Justice and National Commission on Correctional Health Care, Standards for Health Services in Jails). The inmate medication ledger shows regular medication delivery and detailed notes. (Doc. 20-4, pp. 6-42)

Finally, a single instance of receiving an incorrect medication is not indicative of the criminal recklessness necessary to show a pattern or custom of deliberate indifference to medical needs. *See e.g. Johnson v. Douglas County Medical Dept.,* 725 F.3d 825, 828 (8th Cir. 2013) ("a single deviation from a written, official policy does not prove a conflicting custom"); *Popoalii v. Correctional Med. Servs,* 512 F.3d 488, 499 (8th Cir. 2008) ("Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct") (internal quotation marks and citations omitted).

Thus, Plaintiff's allegations regarding the lack of 24/7 medical staffing and correctional officers passing out medication do not state a claim for an Eighth Amendment violation.

This leaves Plaintiff's allegations that correctional officers had "no clue" how to respond to seizures, failed to put something soft under his head, and in one case put a spoon in his mouth. He testified this resulted in concussions and a chipped tooth. These allegations can be construed as a failure to train. However liability for a failure to train requires a showing that the administration "had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *See Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001). The record is devoid of such notice. Nothing in the incident reports or medication ledger submitted showed a lack

5

of appropriate responses or lack of care on the part of the correctional officers. Defendants provided several incident reports on Plaintiff's seizures from the jail. (Doc. 20-3, pp. 1-5) In each case, LifeNet was called. In one instance, a blanket was placed under Plaintiff's head. (Doc. 20-3, p. 4) In another, officers physically picked him up and put him on a cot. (Doc. 20-3, p. 3) In yet another, the officers held him on his side. (Doc 20-3, p. 5) In this last instance, the report indicates Lifenet personnel advised the officers that Plaintiff was in fact faking his illness. Notably, there are no medical records indicating either a chipped tooth or a concussion provided by Plaintiff or Defendants.

    Although Plaintiff may disagree with the efficacy of some of the officers' actions, Plaintiff does not allege correctional officers intentionally delayed their responses in attempting to aid him or in calling LifeNet. Additionally, Plaintiff has been non-compliant in his treatment plan and in following medical advice on more than one occasion. In one instance, Plaintiff refused to go to the hospital after being checked out by the LifeNet paramedic. (Doc. 20-3, p. 4) Additionally, as discussed below, there is also considerable evidence in the record that Plaintiff was non-compliant with his medical treatment, requiring extensive efforts on the part of Defendant Reeves and the correctional officers to ensure he actually took his seizure medicine as prescribed by his treating free-world neurologist, Dr. Brady.

    Based on these facts, there is no evidence in the record to support an official capacity claim.

**B. Individual Capacity Claim - Defendant Nurse Reeves**

In his Complaint, Plaintiff alleges Defendant Reeves intentionally delayed his access to a specialist and provided "grossly inadequate treatment." (Doc. 1, p. 5) He indicated he arrived at the GCDC on August 13, 2012. He states he told Mercy Hospital on October 2, 2012 that he had been

seen by a neurologist. Thereafter, he first saw a neurologist, Dr. Brady, on October 15, 2012. (Doc. 1, p. 4) He also states that a prescription from an emergency room physician at National Park Medical Center increased his Amitryptiline as a sleep aid, but Dr. Brady refused to prescribe it. (Doc. 1, p. 4) Finally, he alleges he talked to Defendant Reeves on December 11, 2013, explaining his problems, and she said she would contact Dr. Brady. He states he received no treatment and had a seizure on December 18, 2013. (Doc. 1, p. 5)

At the hearing, Plaintiff testified he was booked into the GCDC in August. He said he told Defendant Reeves he had seizures, and she said she would set him up with the jail Doctor. She did. The jail Doctor said to set up an appointment with a neurologist. Plaintiff testified Dr. Brady said he would see him on October 2, but actually saw him on October 15.[1] When asked if he told anyone he was seeing a neurologist prior to October 2, 2012, Plaintiff testified he did not.

Plaintiff testified he was provided with anti-seizure medication throughout his time at GCDC. He stated, however, sometimes he got too much medication, and other times not enough, because Dr. Brady was "trying to level him out." He testified "he was at the ER too many times to count for seizures." Other than these statements, Plaintiff made no other allegations about the adequacy of the care provided by Defendant Reeves. When asked why he was non-compliant with his medication, Plaintiff testified, "I only spit it out when I had too much medication in my system."

In their Motion for Summary Judgment, Defendants provided a medication ledger from August 15, 2012 to January 23, 2014. This ledger shows daily medication notes during this time, with detailed notations concerning any changes to medication. It also notes changes to liquid seizure

---

[1] At the hearing, Plaintiff first testified he did not see Dr. Brady until December, but then apologized and corrected that to October 15 when questioned by the Court.

7

medication and instructions for Plaintiff to drink eight ounces of water and have his oral cavity checked after medication.

Defendant Reeve's affidavit states Plaintiff had "countless medical visits in jail, outside medical appointments and appointments with specialists, since August 2012, Mr. Vandermolen has probably been taken to the hospital an average of three (3) to four (4) times per month." (Doc. 20-4, ¶ 5) She states, "he has been provided with anti-seizure medication and his other prescribed medications throughout his incarceration."  (Doc. 20-4, ¶ 6) She noted he had been caught purposefully discarding or vomiting his medications on numerous occasions. (Doc. 20-4, ¶ 8) Officers also found a pill in his cell during a routine search of his property. (Doc. 20-4, ¶ 9) For this reason, he started receiving some of his medications in liquid form.  He still managed to be non-compliant, as indicated by the either "low levels or wildly varying levels of his anti-seizure medication in his blood." (Doc. 20-4, ¶ 11) According to Defendant Reeves, the situation got so bad that Lt. Radley sent out a memo, "pursuant to Dr. Brady's orders, to have Mr. Vandermolen brought to the booking room for his medication and to be held there for one (1) hour to be monitored." (Doc. 20-4, ¶ 12)  After this was instituted, Plaintiff was still found to have thrown up his medication. (Doc. 20-4, ¶¶ 13, 14) Dr. Brady then ordered Plaintiff to be observed for one hour after being given medications, and for Plaintiff's oral cavity to be searched after he was given medication. (Doc. 20-4, ¶ 15) Even these measures did not solve the problem of Plaintiff's medication non-compliance as officers found cups containing Plaintiff's liquid medications during cell searches. (Doc. 20-4, ¶ 16)

Regarding Plaintiff's allegation that she ignored his medical complaint on December 11, 2013, Defendant Reeves stated Plaintiff filed a medical complaint on December 11, 2013 complaining of weakness and numbness in his arms and legs as well as headaches.  She responded

8

to his complaint the next day, noting she had already called Dr. Brady and was waiting for a reply. (Doc. 20-4, ¶ 19)

Defendants supplied several exhibits demonstrating Plaintiff's non-compliance with medication and supporting Defendant Reeves' affidavit. (Docs. 20-4, p. 43-54) Most notable was a photograph of medication found in Plaintiff's cell on April 3, 2014. This showed approximately eleven (11) pills and two cups of liquid medication. (Doc. 20-4, p. 55)

Thus, Plaintiff's allegations that Defendant Reeves delayed his access to a specialist and provided grossly inadequate care are blatantly contradicted by the record, including his own testimony. Plaintiff was booked into GCDC on August 15, 2012 and did not tell anyone he had been seeing a neurologist until October 2, 2012. He was seen by the nurse and the jail doctor repeatedly. He was taken to the ER repeatedly. He saw the neurologist within two months of being booked, and within two weeks of telling anyone he had been seeing a neurologist prior to being arrested. Both time periods would be an excellent turnaround time for a free-world individual seeking to begin care with a medical specialist. The medication ledger shows no gaps in medication delivery. Plaintiff testified he received his medication regularly throughout his incarceration. Dr. Brady, Defendant Nurse Reeves, and the corrections officers made extensive efforts to ensure Plaintiff actually took his medication as prescribed by his medical specialist. Plaintiff admitted he spit his medication out at times. Based on this record, it appears Defendant Reeves made every possible effort to aid Plaintiff in controlling his seizures despite Plaintiff's persistent non-compliance.

### C. Individual Capacity Claim - Defendant Branstetter

In his Complaint, Plaintiff argues Defendant Branstetter violated his rights by signing his name to a medical complaint that should have been sent to Defendant Reeves because Branstetter

has no medical training or background or certificate. At the hearing, he further complained that Defendant Branstetter was in violation of HIPAA because he should not have been able to know his medication.

HIPAA did not create a private right of action, and therefore cannot be privately enforced though Section 1983. *Dodd v. Jones*, 623 F.3d 563, 569 (8th Cir. 2010); *Dockery v. Correctional Medical Services*, 2007 WL 1560317 (D. Nebraska 2007).

The medical complaint in question is dated December 18, 2013. In it, Plaintiff states Dr. Brady is refusing to give him anything to sleep. He states an ER doctor increased his amitryptiline dosage. Defendant Branstetter replied on December 19, 2012 stating Dr. Brady has refused to do so. He directed Plaintiff to ask Dr. Brady for an increase on his next visit with him, as Dr. Brady is his attending physician. (Doc. 20-4, p. 58) Defendant Reeves was not on duty when the complaint was filed. (Doc. 20-4, p. 4)

Nothing in this response required medical training or background. Nor was Plaintiff alleging any emergency medical need to which Defendant Banstetter should have responded with access to immediate professional medical care. As discussed above, it is acceptable for non-medically trained prison staff to administer prescription medication. Thus, there is no constitutional violation when non-medically trained staff promptly respond to a non-emergency medical complaint when medical staff are not present. *See e.g. Cody v. Hillard,* 599 F. Supp. at 1055 ("deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment") (internal quotations omitted).

## IV. CONCLUSION

For the foregoing reasons, I recommend Plaintiff's oral Motion to Dismiss Defendant Brady

be **GRANTED**, and that he be dismissed from this action with prejudice. I further recommend that Defendants' Motion for Summary Judgment (Doc. 19) be **GRANTED**, and that Plaintiff's Complaint be dismissed against all remaining parties with prejudice.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED this 11th day of January, 2016.**

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE